MANUFACTURERS NATIONAL BANK OF DETROIT v
DEPARTMENT OF NATURAL RESOURCES

Docket Nos. 69371, 69372. Argued March 6, 1984 (Calendar No. 4).—
Decided December 28, 1984. Released January 9, 1985.

Joseph Komrska and Adeline K. Werp leased oil and gas rights in
their property located in the northern lower peninsula to the
Shell Oil Company in 1968. Shell also entered into similar
leases with other property owners in the same area. The
Director of the Department of Natural Resources, acting as the
Supervisor of Wells, established 80-acre drilling units for the
area. In 1974, after discovering oil and gas in the area, Shell
was granted permission by the supervisor to expand the unit
size to 240 acres. Komrska and Werp brought an action in the
Ingham Circuit Court against the supervisor, Shell, and North-
ern Michigan Exploration Company (NOMECO), seeking review
of the order permitting expansion on the ground that nonpro-
ductive land would be included in the expanded area and thus
the royalties they would receive from the oil and gas extracted
would be reduced. The court, Ray C. Hotchkiss, J., after re-
mand to the supervisor, affirmed the order as a proper exercise
of the supervisor's authority. Upon the death of Joseph
Komrska, Manufacturers National Bank of Detroit, as trustee,
was substituted as a party plaintiff. The Court of Appeals, R. B.
Burns, P.J., and D. F. Walsh and Clements, JJ., affirmed the
expansion order, but did not decide the issue of royalties
because the plaintiffs had an administrative remedy for ineq-
uity caused by the expansion by seeking reallocation under the
order. (Docket No. 77-4909). On rehearing, after being informed
by counsel for the supervisor that allocation of production of
the well was a matter of contract between the plaintiffs and
Shell and that the supervisor would not provide reallocation for
the plaintiffs, the Court of Appeals, R. B. Burns, P.J., and D. F.
Walsh and D. C. Riley, JJ., remanded the case to the supervisor
with instructions to apply the allocation formula provided by

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 38 Am Jur 2d, Gas and Oil §§ 157, 159, 164 et seq.
Validity of compulsory pooling or unitization statute or ordinance
requiring owners or lessees of oil and gas lands to develop their
holdings as a single drilling unit and the like. 37 ALR2d 434.

statute, subject to the defense that the parties agreed to a different formula. On remand, the supervisor found that allocation of production was governed by the contract. The Court of Appeals again remanded the case to the supervisor to adjust allocation of royalties according to the formula set forth in its original opinion (Docket No. 77-4909). The department, Shell, and NOMECO appeal.

In an opinion by Justice Brickley, joined by Chief Justice Williams and Justices Ryan, Cavanagh, and Boyle, the Supreme Court *held:*

The pooling that occurred in this case was done by Shell under the authority of specific provisions in the lease between the plaintiffs and Shell. The plaintiffs delegated the power to pool to Shell and agreed on the formula to allocate production of the well. The creation of a drilling unit by the Director of the Department of Natural Resources in his capacity as Supervisor of Wells did not amount to a pooling of the legal interests of landowners within the unit or an allocation of the production of the well.

1. The Supervisor of Wells is charged with preventing waste in the drilling of oil and gas wells. The drilling of unnecessary wells is waste. To prevent the drilling of unnecessary wells, the supervisor may establish drilling units which are comprised of the maximum area that may be efficiently and economically drained by one well. In determining the size of a drilling unit, the ownership of the land is not considered. No oil or gas well may be drilled without a permit from the supervisor. Where a landowner's property is smaller than the size of a drilling unit, it is necessary to "pool" other tracts of land in the same area to qualify for a permit. The manner in which the production of the well is distributed generally is a matter of private contract.

2. In this case, the supervisor originally established 80-acre drilling units in the area in which the plaintiffs' property is located. Upon determining that a 240-acre unit in this area was capable of being drained by one well, and that the original 80-acre units would result in waste, the supervisor, upon petition of Shell, expanded the size of the units. The contract between Shell and the plaintiffs and Shell and NOMECO and other landowners in the unit delegated the power to pool and to allocate production to Shell and NOMECO, and the pooling was accomplished by Shell and NOMECO. Under the circumstances of the case, the terms of the pooling and the allocation are governed by the contract.

Justices Kavanagh and Levin concurred in the result only.

Reversed.

115 Mich App 294; 320 NW2d 403 (1982) reversed.

1. MINES AND MINERALS — OIL AND GAS — DRILLING UNITS —
   POOLING — ALLOCATION OF PRODUCTION.

   The creation of a drilling unit by the Director of the Department
   of Natural Resources in his capacity as Supervisor of Wells did
   not amount to a pooling of the legal interests of landowners
   within the unit or an allocation of the production of the well
   (MCL 319.1 *et seq.;* MSA 13.139[1] *et seq.).*

2. MINES AND MINERALS — OIL AND GAS — DRILLING UNITS.

   Areas of land which comprise the maximum area that may be
   efficiently and economically drained by an oil or gas well may
   be designated as drilling units by the Director of the Depart-
   ment of Natural Resources in his capacity as Supervisor of
   Wells so as to prevent the waste of oil and gas and gas
   pressure, unnecessary surface destruction, or damage to the
   area above or below ground (MCL 319.1, 319.2[1], 319.5, 319.13;
   MSA 13.139[1], 13.139[2][1], 13.139[5], 13.139[13]).

3. MINES AND MINERALS — OIL AND GAS — DRILLING UNITS —
   DRILLING PERMITS — POOLING.

   Drilling by an owner of land of an oil or gas well may not begin
   until a permit is obtained from the Supervisor of Wells, and,
   where the owner's land is smaller than the size of the drilling
   unit established for the area in which the land is located, a
   permit will not be issued, absent unique circumstances that
   would permit drilling without waste, until the land is pooled
   with that of others to comprise an area the size of a drilling
   unit (MCL 319.13; MSA 13.139[13]; 1979 AC, R 1204,
   299.1205[1]).

4. MINES AND MINERALS — OIL AND GAS — DRILLING UNITS —
   POOLING — ALLOCATION OF PRODUCTION.

   Pooling of land owned by various persons so as to comprise a
   drilling unit as established by the Supervisor of Wells may be
   accomplished by voluntary agreement or compelled by order of
   the supervisor where the owners are unable to agree; allocation
   of shares of the oil or gas produced under a voluntary agree-
   ment will depend on the terms of the agreement, but, where
   pooling is compelled, allocation must be accomplished in a
   manner that will enable each owner to receive a just and
   equitable share of the oil or gas produced (MCL 319.13; MSA
   13.139[13]; 1979 AC, R 1204, 299.1205[1]).

*Lynch, Gallagher, Lynch, Shirley, Martineau &*

*Campbell* (by *Byron P. Gallagher)* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Terrence P. Grady* and *Russell E. Prins,* Assistant Attorneys General, for the Department of Natural Resources.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Harvey J. Messing, Michael G. Oliva,* and *Ronald W. Bloomberg)* and *Joseph H. Fields* and *William H. Stephens, III,* for Shell Oil Company and Northern Michigan Exploration Company.

BRICKLEY, J. The questions in this case are whether the creation of a drilling unit by the Director of the Department of Natural Resources, in his capacity as Supervisor of Wells,[1] amounts to a pooling of the legal interests of those whose lands are within the unit, and, if so, whether the Supervisor of Wells may permissibly allocate the production royalties of the well to lands within the unit which are not underlain by oil or gas. We answer the first question in the negative and, therefore, do not reach the second question.

Plaintiffs[2] have leased the oil and gas rights in their 80-acre farm to Shell Oil Company, retaining a 1/8 interest in the production as a royalty. They claim that the Supervisor of Wells, by establishing a 240-acre drilling unit, pooled their royalty interest with the interests of other royalty owners. Plaintiffs further claim that the Supervisor of Wells has ordered royalty payments to be made to

---

[1] MCL 319.3; MSA 13.139(3) provides that the "director of the department of natural resources shall act as the supervisor of wells."

[2] This action was initiated by Adeline Werp and her father, Joseph Komrska. Manufacturers National Bank has been substituted for Joseph Komrska, now deceased, under a trustee agreement.

all royalty holders on the basis of the relation that each royalty owner's surface acreage bears to the 240-acre drilling unit. Since it is undisputed that approximately 100 acres of the drilling unit are not underlain by the oil and gas pool, while most of plaintiffs' land in the unit is underlain by oil and gas, plaintiffs claim that their royalty has been reduced by the amount allocated to the owners of "barren" land. The Supervisor of Wells, Shell Oil Company, and the Northern Michigan Exploration Company (NOMECO), on the other hand, contend that the legal interests of the royalty owners within the unit were pooled by private action pursuant to the leases granting Shell Oil Company and NOMECO the oil and gas rights in the lands within the drilling unit. They also contend that royalties are being properly paid on a surface-acreage basis pursuant to those same leases. In a series of opinions, the Court of Appeals agreed with plaintiffs. We now reverse.

I

An overview of the statutes and regulations regarding the Supervisor of Wells' power over oil and gas is necessary for an understanding of this case.

The mission of the Supervisor of Wells is to prevent waste in oil and gas drilling. MCL 319.1; MSA 13.139(1), MCL 319.5; MSA 13.139(5). Waste is broadly defined to include the waste of oil and gas and gas pressure, unnecessary surface destruction, and, generally, anything that would tend to unnecessarily damage the above- or below-ground environment. MCL 319.2(1); MSA 13.139(2)(1). More particularly, the drilling of unnecessary wells is twice defined as waste. MCL 319.2(1)(3); MSA 13.139(2)(1)(3), MCL 319.13; MSA 13.139(13). In part, MCL 319.13; MSA 13.139(13) provides:

"The drilling of unnecessary wells is hereby declared waste as such wells create fire and other hazards conducive to waste, and unnecessarily increase the production cost of oil and gas to the operator, and thus also unnecessarily increase the cost of the products to the ultimate consumer."

To prevent unnecessary wells, and, therefore, prevent waste, the supervisor may establish drilling units. The establishment of a drilling unit prevents unnecessary wells because the size of the unit depends on the area that can be drained by one well, and only one well is allowed in a drilling unit:

"To prevent the drilling of unnecessary wells the supervisor, after conference and recommendation by the board, may fix a drilling unit for each pool. A drilling unit, as contemplated herein, means the maximum area which may be efficiently and economically drained by 1 well and such unit shall constitute a developed area as long as a well is located thereon which is capable of producing the economically recoverable oil or gas thereunder. Each well permitted to be drilled upon any drilling unit shall be located in the approximate center thereof, or at such other location thereon as may be necessary to conform to a uniform well spacing pattern as adopted and promulgated by the supervisor after due notice and public hearing, as provided in this act." *Id.*

Furthermore, no one may drill for oil and gas without applying for and receiving a drilling permit from the Supervisor of Wells. MCL 319.23; MSA 13.139(23).

When there is but one owner of all the land in the area the supervisor has designated as a drilling unit, that owner alone may simply apply for a permit to drill. If, however, different persons own the lands within the unit, problems arise. If an

individual owner's land is smaller than the size of the drilling unit established for the oil or gas pool, the owner will be prohibited from drilling, unless unique circumstances would allow a well to be drilled on that land without waste. Therefore, so that the owners of land within a drilling unit can join together to apply for a drilling permit, there is the concept of pooling.

The term "pooling" has been defined as a term "properly used to denominate the bringing together of small tracts sufficient for the granting of a well permit." Williams and Meyers, 8 Oil and Gas Law, p 554. Private pooling agreements generally provide for the manner in which the production of the single well in the unit will be distributed to the landowners. See 8 Williams and Meyers, *supra,* pp 555-556. On the subject of pooling, MCL 319.13; MSA 13.139(13) provides:

"The pooling of properties or parts thereof shall be permitted, and, if not agreed upon, the supervisor after conference with and recommendations by the board, may require such pooling in any case when and to the extent that the smallness or shape of a separately owned tract or tracts would, under the enforcement of a uniform spacing plan or proration or drilling unit, otherwise deprive or tend to deprive the owner of such tract of the opportunity to recover or receive his just and equitable share of the oil or gas and gas energy in the pool. * * * All orders requiring such pooling shall be upon terms and conditions that are just and reasonable, and will afford to the owner of each tract in the pooling plan the opportunity to recover or receive his just and equitable share of the oil or gas and gas energy in the pool as above provided, and without unnecessary expense, and will prevent or minimize reasonably avoidable drainage from each developed tract which is not equalized by counter drainage. The portion of the production allocated to the owner of each tract included in a drilling unit formed by voluntary agreement or by a pooling order shall, when produced, be considered as if

it had been produced from such tract by a well drilled thereon."

Additionally, the Supervisor of Wells has promulgated the following rules regarding pooling:

"The lessees or lessors, or both, of separate tracts or mineral interests which lie partially or wholly within an established drilling unit may pool or communitize such tracts or interests to form full drilling units and to develop such units in accordance with the provisions of these general regulations and any applicable order of the supervisor." 1979 AC, R 299.1204.

"The supervisor may require the pooling of tracts or mineral interests within a drilling unit when the owners of such tracts or mineral interests have not agreed, or do not agree, upon the pooling of said interests to form full drilling units in accordance with these general regulations and any applicable spacing order. Such compulsory pooling shall be done on a basis which will permit each owner of an interest within a drilling unit the right and opportunity to receive his just and equitable share of the production from the unit. Compulsory pooling shall be adopted by the supervisor only after public hearing as provided in R 299.2004, after conference with and recommendation by the advisory board, for the purpose of preventing waste, and to prevent the drilling of unnecessary wells." 1979 AC, R 299.1205(1).

II

The Northern Trend, a relatively narrow trend of Niagara rock, 12 to 23 miles wide, extends across the northern portion of the lower peninsula. Small areas of gas-bearing reefs (normally limestone formed by the bodies of marine animals surrounded by non-porous rock) are scattered throughout. The present case involves lands over the Grant 13-23N-12W Salina-Niagaran Formation Pool (Grant-13 Pool).

In 1968, appellant Shell Oil Company entered

into from 10,000 to 15,000 oil and gas leases in the northern lower-peninsula area. Among those leases are the ones involved in the present case.

On April 25, 1968, plaintiffs leased to Shell Oil Company the oil and gas rights in their 80-acre farm (two quarter-quarter sections). Also in 1968, other leases were entered into by either Shell Oil or NOMECO with Charles and Anna Svec, and Herbert and Bessie Davis. These leases account for nearly all the land and property rights involved in the present case and were on similar terms. As is typical in the industry, the lessor-landowner retained 1/8 of the production from the land as a royalty, while the lessee received the 7/8 working interest in the oil and gas.

Special Order No. 1-73 of the Supervisor of Wells established 80-acre drilling units for the Northern Trend. This order did not relate to any particular land, but, in effect, forbade drilling more than one well on an area consisting of adjoining quarter-quarter sections. In paragraphs F, G, and H it provided:

"(F) Communitization to Form Drilling Units

"All royalty and working interests within a drilling unit shall be communitized and each royalty owner therein shall participate in the royalty from the well drilled thereon in the relation that the acreage of such owner bears to the total acreage of the unit.

"(G) Statutory Pooling

"In the event there are divided or undivided interests within any unit subject to this order, and the parties are unable to agree on a voluntary plan for the development of the unit, their rights and equities shall be determined by the Supervisor of Wells following a public hearing held in accordance with the provisions of the statute specified herein.

"(H) Exceptions

"Exceptions to this order may be granted by the

Supervisor of Wells in accordance with the provisions of the statutes specified herein."

At the time plaintiffs entered into their lease, no seismic data were available. Surveys were undertaken by Shell in 1972 and by NOMECO in 1973. In 1974, the Grant-13 pool was discovered. Three exploratory wells were then drilled. One well, at the southern end of the pool, is on plaintiffs' land, originally within an 80-acre drilling unit established by Special Order No. 1-73 and made up of 40 acres of plaintiffs' land and 40 acres of Svec land. Studies showed the three wells to be located over a common gas reservoir comprising some 400 acres.

In 1974, Shell obtained a drilling permit for the 80-acre Komrska-Svec unit. Then, with the obvious intention of seeking an expanded drilling unit, Shell and NOMECO acquired from Consumers Power Company (NOMECO's parent corporation) and Herbert and Bessie Davis leases covering an additional 15 acres, filling in all gaps in what Shell and NOMECO would propose as a 240-acre drilling unit.

On December 16, 1974, Shell petitioned the Supervisor of Wells to expand the 80-acre Komrska-Svec drilling unit to 240 acres. Following public hearings, the supervisor, on April 15, 1975, granted the petition over the opposition of the plaintiffs. Among his findings of fact was that one well was capable of draining 240 acres and that 80-acre units would result in unnecessary wells in violation of statute.

On July 31, 1975, Shell and NOMECO entered into an agreement to operate the well, now known as Komrska-Svec No. 1-23, in the now expanded drilling unit. Shell was to be the operator, with full control over drilling. Shell and NOMECO then

filed with the Register of Deeds of Grand Traverse County a Declaration of Pooling dated September 26, 1975. The agreement purported to pool the lands in question within the 240-acre unit under the authority of the leases given by the owners of the lands within the unit. Paragraph 16 of plaintiffs' lease, and of the other leases with some minor differences, provides:

"Lessee is hereby given the right, at its option, at any time and from time to time during the continuance hereof, and whether before or after production, to unitize and pool for development and operation purposes all or any part or parts of leased premises, or rights therein, with any other land in the vicinity thereof, or with any leasehold, operating, or other rights or interests in such other land so as to create units of such size and surface acreage as lessee may desire, but containing not more than 88 acres; provided, however, a unit may be established hereunder containing not more than 640 acres, plus 10% acreage tolerance, if unitized only as to gas rights or only as to gas and condensate. Each unit shall be created by lessee's recording an instrument identifying the unit so created. Any well drilled or operations conducted on any part of any lands so pooled shall be considered a well drilled or operations conducted on leased premises under this lease, and there shall be allocated to the portion of leased premises included in any such unit such proportion of the actual production from all lands in such unit as such portion of leased premises, computed on an acreage basis, bears to the entire acreage of such unit. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production from the portion of leased premises included in such unit in the same manner as though produced from such portion of leased premises under the terms of this lease."

In the meantime, on June 23, 1975, plaintiffs sought review of the Supervisor of Wells' order

expanding the unit. Following a remand to the supervisor for procedural reasons, the circuit court affirmed the order of the Supervisor of Wells expanding the drilling unit. Plaintiffs then took the case to the Court of Appeals.

Plaintiffs attacked the practice of creating drilling units by adding together only quarter-quarter sections of land, instead of simply having the drilling unit follow the contour of the pool. This practice, in combination with the mandated surface-acreage basis for allocating production contained in paragraph F of Special Order No. 1-73, acted to allocate plaintiffs' royalties to the barren land of others. The Court of Appeals, however, found the use of quarter-quarter sections to establish drilling units to be a reasonable practice.

The Court found that establishing a drilling unit along the exact boundaries of a pool would require the wasteful drilling of many wells to determine the pool's exact perimeter. The propriety of paragraph F of Special Order No. 1-73 was not decided because the Court found that an administrative remedy existed. The Court suggested that plaintiffs apply to the supervisor for an exception to Special Order No. 1-73 pursuant to paragraph H of that order, declining to assume that the supervisor would not grant an "appropriate adjustment." The Court noted that MCL 319.13; MSA 13.139(13) requires that production must be allocated on "terms and conditions that are just" when the supervisor compels the pooling of properties, which, to the Court of Appeals, meant that in the absence of evidence of the depth of the pool, production should be allocated in the proportion a royalty owner's land underlain by the pool bears to the entire pool. The Court refused to consider the applicability of plaintiff's lease with Shell Oil Company, finding that issue not properly before

the Court. 85 Mich App 173, 180; 270 NW2d 550 (1978).

Plaintiffs moved for a rehearing. The Court of Appeals, after being informed by the Supervisor of Wells that the allocation of production was a matter of contract and that the supervisor would not reallocate production in a manner different from that provided in the lease between plaintiffs and Shell, granted the motion. The Court of Appeals ordered the case remanded to the Supervisor of Wells for a reallocation of production in accordance with its prior opinion stating that the lease between plaintiffs and Shell could be offered as a defense to the reallocation.

On remand, the supervisor, after hearings, again held against plaintiffs. The supervisor found that plaintiffs' lease to Shell authorized Shell to pool the lands in the drilling unit and allocate production on a surface-acreage basis. He also found that Shell had used its power under the lease to pool and allocate. He found that paragraph F of Special Order No. 1-73 voiced but a preference for surface-acre formulas but did not impose the formula on persons who had agreed otherwise. The supervisor stressed that the creation of a drilling unit did not, by itself, pool anything. He ordered that the production of the well be allocated per paragraph 16 of the lease.

The case returned to the Court of Appeals. After setting forth the history of the case and the supervisor's argument that pooling was accomplished pursuant to paragraph 16 of the lease, the Court stated:

"The fallacy with the supervisor's holding is that the pooling and creation of drilling units was not done by Shell. The pooling and creation of drilling units was done by the Supervisor of Wells under MCL 319.13; MSA 13.139(13), which provides:

" 'To prevent the drilling of unnecessary wells the supervisor, after conference with and recommendation by the board, may fix a drilling unit for each pool. A drilling unit, as contemplated herein, means the maximum area which may be efficiently and economically drained by 1 well * * *.

" 'The drilling of unnecessary wells is hereby declared waste * * *.'

"This case is remanded to the Supervisor of Wells to adjust the allocation of royalties using the formula set forth in our original opinion." 115 Mich App 294, 300; 320 NW2d 403 (1982).

We granted the applications for leave to appeal filed by Shell and NOMECO and the Supervisor of Wells. 417 Mich 1042 (1983).

## III

The essence of this case is plaintiffs' claim that when the drilling unit was expanded to 240 acres, barren land was included within the unit, transferring some of plaintiffs' 1/8 royalty interest to the owners of barren land. Had this transfer occurred at the direction of the Supervisor of Wells, we might have to agree with plaintiffs that the action violated the statutes of this state. Michigan is an ownership-in-place state. That is, a surface owner owns the oil and gas beneath his land. *Attorney General v Pere Marquette R Co,* 263 Mich 431; 248 NW 860 (1933); *Quinn v Pere Marquette R Co,* 256 Mich 143; 239 NW 376 (1931). MCL 319.13; MSA 13.139(13) provides that when the Supervisor of Wells pools separate ownership interests within a drilling unit and allocates production to those lands he must do so on "terms and conditions that are just and reasonable," giving each landowner the "opportunity to recover or receive his just and equitable share of the oil or gas." An order of the

supervisor allocating production to barren lands might not meet such a standard. However, we find that the Supervisor of Wells has not pooled the properties involved in the present case. Nor has he allocated the production of the well. Those events took place as a result of private contracts, and, for that reason, plaintiffs' claim must fail.

The purpose of a drilling unit is the prevention of unnecessary wells. MCL 319.13; MSA 13.139(13) allows the Supervisor of Wells to establish the size of the drilling units in an entire pool. That portion of the statute relating to drilling units makes no mention of altering ownership interests when determining the proper size for drilling units in a pool. Indeed, the ownership of the land involved is not even considered when determining the proper size for the units. 1 Summers, Oil and Gas, § 83, p 279. Therefore, we cannot agree with plaintiffs and the Court of Appeals when they state that plaintiffs' ownership interest was pooled with the interests of others when the 240-acre drilling unit was established.

We find the case law relied upon by plaintiffs to be quite distinguishable. *Hladik v Lee,* 541 P2d 196 (Okla, 1975), *Petroleum Reserve Corp v Dierksen,* 623 P2d 602 (Okla, 1981), *Ward v Corporation Comm,* 501 P2d 503 (Okla, 1972), and *Sunray DX Oil Co v Cole,* 461 P2d 305 (Okla, 1967), *cert den* 396 US 907 (1969), do indeed all suggest that the creation of a drilling unit[3] acts to pool the interests of all royalty holders within the unit and supersedes private agreements. However, drilling units draw their nature from the statutes which authorize their existence. The Oklahoma statute on point provides for the mandatory pooling of

---

[3] Although the Oklahoma courts use the phrase "spacing unit," that phrase is synonymous with the phrase "drilling unit." See 52 Okla Rev Stat, § 87.1(c).

*royalty* interests and for the allocation of produc-
tion to royalty holders:

"In the event a producing well or wells are completed
upon a unit where there are, or may thereafter be, two
or more separately owned tracts, any royalty owner or
group of royalty owners holding the royalty interest
under a separately owned tract included in such spac-
ing unit *shall share* in the one-eighth (1/8) of all
production from the well or wells drilled within the
unit, or in the gas well rental provided for in the lease
covering such separately owned tract or interest in lieu
of the customary fixed royalty, in the proportion that
the acreage of their separately owned tract or interests
bears to the entire acreage of the unit." 52 Okla Rev
Stat § 87.1(e).

Interestingly enough, the Oklahoma statutes re-
fer to only the automatic pooling of royalty inter-
ests. No mention is made of automatic pooling of
working interests, that is, the 7/8 interest of the
lessees within the unit. Apparently, for that rea-
son, the Oklahoma Supreme Court has made the
following statement:

" 'Under Oklahoma law, upon entry of spacing order
by Oklahoma Corporation Commission, royalty interests
arising from land covered by such order are pooled by
operation of law, but working interests therein are
pooled only upon a voluntary agreement or upon a
separate commission forcing unitization.' " *Petroleum
Reserve Corp v Dierksen, supra,* p 605 quoting the
syllabus of *Whitaker v Texaco, Inc,* 283 F2d 169 (CA 10,
1960).

Of course, the Michigan statutes make no men-
tion of the automatic pooling of royalty or working
interests in connection with the establishment of a
drilling unit. We must therefore conclude that the
creation of a drilling unit pools no ownership

interest whatsoever. Courts of other states, in quite different fact situations, have apparently reached the same result under their own statutes. See *Schank v North American Royalties, Inc,* 201 NW2d 419 (ND, 1972); *Amoco Production Co v North Dakota Industrial Comm,* 307 NW2d 839 (ND, 1981); *Alexander v Holt,* 116 So 2d 532 (La App, 1959); *Hughes v Cantwell,* 540 SW2d 742 (Tex Civ App, 1976). The issue which now must be decided is exactly when did the pooling occur in the present case.

Arguably, it was not the creation of the drilling unit which pooled the properties within the unit, but, instead, the pooling and the allocation of production occurred at the time the drilling unit was created because of the existence of Special Order No. 1-73. Again, paragraphs F and G of Special Order No. 1-73 provide:

"(F) Communitization to Form Drilling Units

"All royalty and working interests within a drilling unit shall be communitized and each royalty owner therein shall participate in the royalty from the well drilled thereon in the relation that the acreage of such owner bears to the total acreage of the unit.

"(G) Statutory Pooling

"In the event there are divided or undivided interests within any unit subject to this order, and the parties are unable to agree on a voluntary plan for the development of the unit, their rights and equities shall be determined by the Supervisor of Wells following a public hearing held in accordance with the provisions of the statute specified herein."

Plaintiffs contend that the lands in the unit were pooled together and production was allocated to those lands by force of paragraph F of Special Order No. 1-73. The Supervisor of Wells, however, claims that paragraph F merely states the obvious,

that pooling, either voluntary or involuntary, will occur and that the supervisor has a preference for the surface acreage allocation method. The supervisor claims that paragraph G of Special Order No. 1-73 is the actual pooling provision and it allows the supervisor to pool and allocate only when the parties fail to agree.[4]

The view of the Supervisor of Wells, the party who is charged with the enforcement of the statutes and the party who wrote Special Order No. 1-73, is entitled to deference. See *Magreta v Ambassador Steel Co (On Rehearing)*, 380 Mich 513, 519; 158 NW2d 473 (1968); *Board of Education of Oakland Schools v Superintendent of Public Instruction*, 401 Mich 37, 41; 257 NW2d 73 (1977). Nevertheless, we must reject the view of the Supervisor of Wells. While paragraph F could be read in a manner which would permit voluntary pooling, we disagree that the surface acreage allocation method in that paragraph is permissive.

Paragraph F is written in mandatory language and offers not even the suggestion that any formula other than a surface-acreage method would be acceptable for allocating the production of a well. Of course, if both paragraphs F and G refer to the allocation of production, they are in conflict; F mandates allocation under the surface-acreage method, while G allows the parties to agree on the allocation of production. We need not attempt, however, to reconcile these conflicting provisions.[5] If paragraph F mandates pooling or the allocation

---

[4] All parties agree that the term "communitization" is a synonym for pooling.

[5] Although paragraph G refers to the "statutes specified herein," no statute is specified therein. It is possible, although not suggested by the supervisor, that paragraph G refers to the joinder of undivided interests under MCL 319.101 *et seq.;* MSA 13.140(1) *et seq.,* or, perhaps, even to unitization under MCL 319.351 *et seq.;* MSA 13.139(101) *et seq.*

of production by reference to surface acreage, it is void.

MCL 319.13; MSA 13.139(13) clearly provides that the Supervisor of Wells may only pool lands or allocate production if the parties have not agreed to do so. In part, it states:

"The pooling of properties or parts thereof shall be permitted, and, if not agreed upon, the supervisor after conference with and recommendations by the board, may require such pooling in any case. * * * All orders requiring such pooling shall be upon terms and conditions that are just and reasonable, and will afford to the owner of each tract in the pooling plan the opportunity to recover or receive his just and equitable share of the oil or gas * * *."

To the extent that an administrative order conflicts with a statute, the order is void. See *Coffman v State Bd of Examiners in Optometry,* 331 Mich 582; 50 NW2d 322 (1951); *Chesapeake & O R Co v Public Service Comm,* 59 Mich App 88; 228 NW2d 843 (1975). Therefore, paragraph F cannot be read to pool lands or allocate production when the parties have already done so.

The question remains whether these properties have ever been pooled. The answer is found in the private contract between plaintiffs and Shell. In their lease to Shell, plaintiffs, in paragraph 16, delegated to Shell the power to pool plaintiffs' lands with the land of others in the unit. Shell took unequivocal action to do so by filing its declaration of pooling in the office of the Register of Deeds of Grand Traverse County. Plaintiffs' lease specifically provides that the allocation of production in a pooled unit shall be on a surface-acreage basis. Having been given no reason why the contractual agreement in the lease between plaintiffs and

Shell should not be respected,[6] we can look only to that lease to determine the rights of the parties. Since plaintiffs delegated the power to pool to Shell and agreed on the formula to allocate the production of the well, it is on those terms that the agreement must be enforced.

Reversed.

WILLIAMS, C.J., and RYAN, CAVANAGH, and BOYLE, JJ., concurred with BRICKLEY, J.

KAVANAGH and LEVIN, JJ., concurred in the result only.

---

[6] Plaintiffs can hardly contend that they relied on paragraph F of Special Order No. 1-73 and, therefore, did not attempt to change the terms of paragraph 16 of their lease through negotiations. They signed the lease in 1967, while the order was not issued until 1973. At the time they signed their lease, it was just as likely that most of *their* land was barren. Moreover, plaintiffs could have simply refused to lease their oil and gas rights. Had they not leased their rights and had oil or gas been discovered on other lands within the unit they could have forced the supervisor to pool their land on "terms and conditions that are just and reasonable." MCL 319.13; MSA 13.139(13).