WEST BAY EXPLORATION COMPANY v AMOCO PRODUCTION
COMPANY

Docket No. 78016. Submitted March 6, 1985, at Grand Rapids.—
Decided January 7, 1986. Leave to appeal applied for.

Plaintiffs, West Bay Exploration Company, Home-Stake Oil &
Gas Company, Home-Stake Royalty Corporation, Emma B.
Simpson, trustee, and Thomas E. Matson, brought an action in
the Kalkaska Circuit Court seeking to quiet title to the mineral
rights to certain land located in Kalkaska County. Named as
defendants were Amoco Production Company and Gulf Oil
Corporation. The trial court, William A. Porter, J., entered a
judgment in favor of the plaintiffs. Defendants appeal. The
issue to be decided on appeal is whether or not defendants'
activities near or on the property served to hold the lease
involving the land beyond its primary term in accordance with
conditions specified in the lease and its amendments. If the
lease is found to be extended, then defendants have an interest
in the land which would preclude the trial court's decision and
require reversal. *Held:*

1. Although the habendum provision permitted extension of
the lease for a shut-in gas well on the premises, the shut-in gas
well clause of the February 27, 1976, lease amendment re-
quired defendants to tender payment of a royalty within 90
days of the date the well was shut-in. Since the 1A-13 well was
shut-in during December, 1976, defendants were required to
tender payment no later than March, 1977. Defendants did not
tender payment until October 24, 1978. Therefore, because of

REFERENCES

Am Jur 2d, Appeal and Error § 145.

Am Jur 2d, Estoppel and Waiver § 1.

Am Jur 2d, Gas and Oil §§ 8, 141-144, 206, 214.

Construction and effect of "marketable record title" statutes. 31
ALR4th 11.

"Shut-in royalty" payment provisions in oil and gas leases. 96
ALR2d 345.

Rights and liabilities with respect to natural gas reduced to posses-
sion and subsequently stored in natural reservoir. 94 ALR2d 543.

See also the annotations in the ALR3d/4th Quick Index under
Marketable Title.

defendants' failure to meet the prerequisite of a timely payment, the shut-in well did not serve to extend the lease beyond its primary term. The payment of the shut-in royalty was not timely and thus no constructive production occurred.

2. The actions of the defendants and others in regard to the 1A-13 well did not constitute "gas storage" within the meaning of the original lease sufficient to hold the lease beyond the primary term. The term "storage", as used by the oil and gas industry, contemplates affirmative action. Defendants' decision to leave the gas in place is not the storage of such gas. The fact that the United States Department of Energy's Federal Energy Regulatory Commission issued a certificate permitting gas storage for the 1A-13 well does not constitute gas storage within the meaning of the original lease.

3. The negotiations for and the subsequent sale of the 1A-13 well to ANR Storage did not constitute "production" which would hold the amended lease beyond the primary term.

4. There was no detrimental reliance on the part of the defendants. Therefore, defendants' argument that plaintiffs should be estopped from claiming termination of the amended lease because they accepted a shut-in royalty payments for the 1A-13 well was not accepted by the Court of Appeals.

5. The Court of Appeals deferred to the trial court's finding of fact in regard to the West Big Twin Lake 5-18 well that the governmental survey submitted into evidence by the defendants appeared to establish, contrary to defendants' claim, that the section line between Sections 13 and 18 crossed Big Twin Lake and constituted a section line.

6. The Section 13 lands located adjacent to the Section 24 Fawcett spacing unit, not having been committed to a drilling unit, were not sufficient to hold the amended lease by virtue of the oil and gas lease pooling clause.

7. The terms of pooling and allocation were governed by contract. The fact that the Supervisor of Wells issued an order establishing the boundaries of the Fawcett spacing unit which contains 120 acres from Section 24 and 120 acres from Section 13 does not require an extension of the lease to all Section 13 lands. Private contract, not the statute granting authority to the Supervisor of Wells, governs the manner in which production from a well is distributed.

Affirmed.

1. QUIETING TITLE — APPEAL — FINDINGS OF FACT.

A suit to quiet title is equitable in nature and subject to *de novo* review, but the Court of Appeals will give great weight to the findings of fact made by the trial court and will not disturb

those findings unless convinced it would have reached a different result had it been in the trial court's position.

2. GAS AND OIL — LEASES — CONSTRUCTIVE PRODUCTION — EXTENSION OF LEASES.

Constructive production does not occur for the purpose of permitting the extension of an oil and gas lease beyond its primary term because of a shut-in gas well on the premises where the lessee does not timely tender payment of a shut-in gas well royalty in accordance with the explicit lease provisions pertaining to such an extension; constructive production requires timely payment in accordance with explicit lease provisions.

3. GAS AND OIL — STORAGE — STORED GAS — SUBSURFACE GAS STORAGE.

Stored gas is defined by the oil and gas industry as gas produced from one formation and injected into another depleted formation near the market for purposes of temporary storage; subsurface gas storage is the use of a depleted formation or an aquifer near a market to store gas brought in from another field; the term "storage", as used by the oil and gas industry, contemplates affirmative action.

4. GAS AND OIL — LEASES — PRODUCTION OF GAS AND OIL.

The term "production" contained in the habendum clause in an oil or gas lease means production in paying quantities sufficient to yield a return in excess of operating costs; the question of whether a lessee has produced oil or gas within the primary term of an oil or gas lease so as to hold the lease beyond the primary term is a question of fact to be determined in each case.

5. ESTOPPEL — WORDS AND PHRASES.

Estoppel arises where: (1) a party by representations, admissions or silence induces another party to believe facts; (2) the other party detrimentally relies and acts on this belief; and (3) the other party will be prejudiced if the first party is allowed to deny the existence of the facts.

6. GAS AND OIL — CONTRACTS — DISTRIBUTION OF PRODUCTION.

Private contract, and not the statute which grants authority to the Supervisor of Wells, governs the manner in which the production from an oil or gas well is distributed (MCL 319.1 *et seq.*; MSA 13.139[1] *et seq.*).

*Mika, Meyers, Beckett & Jones* (by *John C. Jones*), for plaintiffs.

*Lynch, Gallagher, Lynch, Shirley & Martineau* (by *William J. Shirley),* for defendants.

Before: Hood, P.J., and MacKenzie and R. D. Dunn,* JJ.

Per Curiam. Defendants appeal as of right from the trial court's judgment entered in this action to quiet title, which affected mineral rights (oil and gas) in land located in Kalkaska County, Michigan. The issue we are called upon to decide is whether or not defendants' activities near or on the property served to hold the lease beyond its primary term in accordance with conditions specified in the lease and its amendments. If the lease is found to be extended, then defendants have an interest in the land which would preclude the trial court's decision and require reversal by this Court. A map of the area is attached (see Appendices A & B). The section numbers 13, 18, 24, etc., are on the map. Areas A, B, C, etc., were drawn in by the trial court.

A suit to quiet title is equitable in nature and thus subject to *de novo* review. We give great weight to the findings of fact made by the trial court, and will not disturb them unless we are convicted that we would have reached a different result had we been in the lower court's position. *Connelly v Buckingham,* 136 Mich App 462, 467; 357 NW2d 70 (1984); *Geneja v Ritter,* 132 Mich App 206, 209-210; 347 NW2d 207 (1984). The relevant findings in this case are fairly complex and will be discussed at some length here.

On October 24, 1964, C. J. Simpson obtained a number of oil and gas leases from Old Kent Bank and Trust Company, Trustees, covering mineral

---

* Circuit judge, sitting on the Court of Appeals by assignment.

rights in several townships in Kalkaska County. A separate lease was obtained for each township. The lessors therein owned and leased the mineral rights only, at that time. The property which is the subject matter of the instant litigation is in Coldsprings Township.

In 1965, C. J. Simpson assigned the leases to defendant Gulf Oil Corporation, and Gulf Oil subsequently assigned a one-half interest therein to defendant Amoco Production Company. Shortly after such assignment, on March 17, 1965, the Old Kent Bank and Trust Company conveyed and quitclaimed to C. J. Simpson all of the oil, gas and mineral rights in the subject property, subject to the above-described lease and amendments thereto. The Old Kent Bank reserved unto itself, out of such conveyance, an undivided one-sixteenth interest in and to the gross sales proceeds from all oil, gas, casinghead gas, coal and other minerals produced, saved or marketed from any of the lands sold. Thereafter, C. J. Simpson conveyed his interest received by quitclaim, subject to the 1964 lease as amended, resulting in the following present ownership of the oil, gas and mineral rights: Home-Stake Royalty Corporation received a three-eighths interest; Lincoln Rock Corporation received a one-twelfth interest; Emma B. Simpson, Trustee, received a one-fourth interest; and Thomas E. Matson received a one-sixth interest.

The primary term of the lease was for ten years, with the lease being extended beyond such primary term "as long thereafter as oil, condensate, gas * * * is produced or there is a shut-in gas well on the premises, or the premises are being used for gas or liquid storage". This is known as an "habendum clause". The clause further provided, "[i]n order for this lease to remain in effect solely by reason of a shut-in gas well either during or

after the primary term, delay rental payments must be made as provided in Paragraph 5".

Paragraphs 17, 18, and 19 were added by the parties and typewritten therein. The lease was otherwise a form lease with its provisions pre-printed. Paragraph 19 limited the premises to which the lease could be extended beyond the primary term to "that portion of the leased premises lying and being situated within the governmental section in which the well is drilled". The pooling clause contained in the printed form, however, provided that a well on any portion of a pooled unit, which included any part of the leased premises, would be considered to be on the leased premises for purposes of the lease.

An amendment to the lease was executed in 1965. The amendment changed the following: the primary term from 10 to 12 years, making the lease expire on October 24, 1976; the delay rental payment for a shut-in gas well was made the same as for the storage of gases or liquids; the delay rental payment provision in Paragraph 5 was deleted in its entirety and the lease was made a paid-up lease. In 1976, an amendment was executed extending the primary term for an additional two years, to a total of 14 years from October 24, 1964. The amendment deleted Paragraph 19 of the original lease and inserted the following:

"19. This lease shall remain in force at the end of the primary term as to all that part of the premises within a governmental section on which operations for drilling of a well or wells have commenced, there is a well currently producing, or capable thereof, and as to lands included in any unit which are in an adjacent governmental section. It is expressly understood that the lease shall not extend beyond the primary term as contemplated herein as to those lands located in a governmen-

tal section on which a well is not producing or capable thereof, or is not being drilled, or has not been committed to a unit. The word 'unit' as used herein is defined as including 'drilling units', 'voluntary pooled units', 'compulsory pooled units', 'production units', and units created by state spacing orders."

Paragraph 4 of the amendment reads:

"4. If at any time after the expiration of the primary term of this lease, there is any gas well on lands covered hereby, which is capable of producing in paying quantities, but is shut-in for a period of 90 days, either before or after production therefrom, and the production is not being sold or used and such leased acreage is not being held by any other terms or provisions hereof, Lessee agrees to pay or tender to the mineral owners entitled to receive same, a royalty, which shall be a sum equal to One Dollar ($1.00) per acre for all that part of the premises included in the unit of said shut-in well. Such payment shall be made on or before 90 days after expiration of the 90 days from the date the well is shut in. This shut-in royalty shall have the effect of holding the lease as to said lands for one year from the date the well is shut in."

Paragraph 5 of the amendment provided that if, after the expiration of the primary term, production ceased, the lease would not terminate if the lessee resumed operations for the drilling of a well for restoration of production within 120 days from cessation, and the lease would continue in force and effect during the continuation of the operations and as long thereafter as there was a well producing, or capable or producing, from the leased premises.

Finally, Paragraph 6 of the amendment provided that the 1964 lease, as amended by the 1965 amendment, was thereby ratified and confirmed.

In May of 1979, the defendants obtained an

amendment extension to all of the properties in Section 13, except the 80 acres contained in the Coldsprings 12 field unit (Area A) and except the 120 acres contained in the Fawcett 2-24 unit (Area C). This amendment extended the primary term to 17 years, resulting in an expiration date of the primary term on October 24, 1981, as to the premises covered by the amendment. The amendment ratified and reaffirmed the original lease and previous amendments.

The Fawcett 2-24 well (in Area D) was drilled in Section 24 in 1977, and was producing prior to October 24, 1978, and at all times thereafter. As indicated, the well was physically located in Section 24. One hundred and twenty acres of the 240-acre production unit for the well was located in Section 13. This 120 acres within the production unit in Section 13 was held by the terms of Paragraph 19 of the 1976 amendment beyond the primary term of the lease up to today's date and is not in contest.

The drilling of the West Big Twin Lake 5-18 well (Area B) was commenced on September 24, 1978, and was successfully completed as a gas well in November of 1978. The well did not begin producing and marketing gas until October 4, 1980. The surface location of this well was located in the Northeast 1/4 of Section 13 and the bottom hole location was in Section 18, Blue Lake Township.

The "thereafter" or habendum clause contained in the Old Kent Bank lease provides that the lease remains in effect as long as 1) oil, gas, or the like is produced, 2) there is a shut-in gas well on the premises, or 3) the premises are being used for gas or liquid storage. The clause contains three distinct concepts which determine whether or not the lease is extended. First is a description which tells

*how* the lease is may be held. Second is the time frame during which the activity must be accomplished or on-going. Third is a description of which lands in Section 13 are held by satisfaction of these conditions. Each of these elements must be met *before* the lease is extended.

Defendants have raised several arguments as to why the lease was extended beyond its primary term. These will be addressed *seriatim.*

### Amoco's Completion of 1A-13 Well in 1976

The 1A-13 well (Area A) was drilled by Amoco in 1976. The well was never hooked to a pipeline, but was capped. It was sold to ANR Storage in July, 1979. Although the habendum provision permitted extension of the lease for a shut-in gas well on the premises, the shut-in gas well clause of the February 27, 1976, lease amendment required defendants to tender payment of a royalty within 90 days of the date the well was shut-in. Since the 1A-13 well was shut-in during December, 1976, defendants were required to tender payment no later than March, 1977. Defendants did not tender payment until October 24, 1978, near the expiration of the primary term. Thus, because of defendants' failure to meet the prerequisite of a timely payment, the shut-in well did not serve to extend the lease beyond its primary term.

Defendants also claim that "constructive production" occurred by payment of the shut-in royalty. However the definition of constructive production requires timely payment in accordance with explicit lease provisions. See 8 Williams & Meyers, Oil and Gas Law, Manual of Oil and Gas Terms (1984), p 161. As previously noted, the payment was not timely and thus no constructive production occurred.

*ANR's Gas Storage in July, 1979*

On July 23, 1979, the United States Department of Energy's Federal Energy Regulatory Commission (FERC) issued a certificate to ANR Storage permitting gas storage for the 1A-13 well. Defendants contend that this activity constituted "gas and liquid storage" within the meaning of the original lease sufficient to hold the lease. There are no reported cases in Michigan which construe the term "storage".

Stored gas is defined as "[g]as produced from one formation and injected into another depleted formation near the market for purposes of temporary storage". Williams & Meyers, *supra,* p 851. Subsurface gas storage is the "[u]se of a depleted formation or an aquifer near a market to store gas brought in from another field". Williams & Meyers, *supra,* p 364.

In light of the meaning given to the term "storage" by the oil and gas industry, we find that the term contemplates affirmative action. Defendants would equate inaction (their decision to leave gas in place) with storage. We are unwilling to adopt such a broad construction and, therefore, conclude that the actions of defendants and ANR did not constitute storage.

*1A-13 Well Production*

Defendants contend that the negotiations for and the subsequent sale of the 1A-13 well to ANR Storage constituted production which held the amended lease beyond the primary term. We disagree. In a "thereafter" clause, the term "production" is construed to mean production in paying quantities sufficient to yield a return in excess of operating costs. *Michigan Wisconsin Pipeline Co v*

*Michigan National Bank,* 118 Mich App 74, 82; 324 NW2d 541 (1982). Whether a lessee has produced oil or gas within the primary term so as to hold the lease is a question of fact to be determined in each case. 2 Summers, Oil and Gas (1959), p 216.

Defendants rely on *Michigan Wisconsin Pipeline, supra,* wherein this Court found that production was obtained by leaving the gas in place. The lower court distinguished *Michigan Wisconsin Pipeline* on its facts and we agree with that analysis. The gas well in *Michigan Wisconsin Pipeline* had been producing but the operators severely cut back production to only the amount necessary to operate heaters at their compressor station and provide the lessors with free domestic gas for their dwellings. In addition, the lessee was faced with an impending condemnation action and this Court found it was reasonable to cease marketing and wait for the award. The instant case is distinguishable because production had never occurred at the 1A-13 well.

## Estoppel

Defendants argue that plaintiffs should be estopped from claiming termination of the amended lease because they accepted a shut-in royalty payment for the 1A-13 well. An equitable estoppel arises where: (1) a party by representations, admissions or silence induces another party to believe facts; (2) the other party detrimentally relies and acts on this belief; and (3) the other party will be prejudiced if the first party is allowed to deny the existence of the facts. *Cook v Grand River Hydroelectric Power Co, Inc,* 131 Mich App 821, 828; 346 NW2d 881 (1984).

On the facts of this case, we find no detrimental

reliance on the part of defendants. It appears that any action or inaction taken by defendants proceeded from defendants' independent and unilateral evaluation of the lease terms and the development activity required to sustain and hold the lease. As the trial court noted, defendants had the highest degree of expertise and sophistication regarding the interpretation of an oil and gas lease.

### West Big Twin Lake 5-18 Well

The 5-18 well (Area B) was drilled September 24, 1978. Production and marketing of the gas from the well began October 4, 1980, within the primary term of the amended lease. The parties agree that the bottom hole, which determines the location of the well, was in Section 18. Still, defendants argue that the 5-18 well does not lie entirely in Section 18 because the section line has meandered along the lakeshore and the lake is therefore neither in Section 18 nor in Section 13.

The trial court found that the governmental survey, submitted into evidence by defendants (but not made available to this Court), appeared to establish that the section line between Sections 13 and 18 crossed Big Twin Lake and constituted a section line, contrary to defendant's claim. We will defer to this finding of fact by the trial court because of its superior position to evaluate the evidence. See *Connelly v Buckingham, supra.*

### Lease Pooling Clause and Spacing Unit Boundary

Defendants contend that the drilling and production of wells located in Section 24 (Area D),

located within a spacing unit which contains Section 13 land (Area C), was sufficient to hold the amended lease by virtue of the oil and gas lease pooling clause. However, the express language of Paragraph 19 of the 1976 amendment does not support this contention because it states that "the lease shall not extend beyond the primary term * * * as to those lands located in a governmental section on which a well is not producing or capable thereof, or is not being drilled, or has not been committed to a unit". Thus, the Section 13 lands located adjacent to the Section 24 Fawcett spacing unit, not having been committed to a drilling unit, were not held by the lease.

Defendants also contend that the fact that the Supervisor of Wells issued an order establishing the boundaries of the Fawcett spacing unit which contains 120 acres from Section 24 and 120 acres from Section 13 requires extension of the lease to all Section 13 lands. While the issue has not been directly addressed in Michigan, our Supreme Court in *Manufacturers National Bank of Detroit v Dep't of Natural Resources,* 420 Mich 128; 362 NW2d 572 (1984), appeared to emphasize that private contract, and not the statute granting authority to the Supervisor of Wells, governs the manner in which production from a well is distributed. 420 Mich 142. In this case, the terms of pooling and allocation were governed by contract.

## Conclusion

Our resolution of the above issues makes it unnecessary to address defendants' last issue, trespass.

Affirmed.

## Appendix A

APPENDIX B

MAP INFORMATION

The appended map represents the well locations and units important to the instant litigation.

"A" designates: 80 acres within Section 13 of the 120 acre "Coldsprings 12" unit containing:

(1) the Simpson-State-Coldsprings 1A-13 drilled fall of 1976 and completed and shut in in December.

(2) the 12-10A storage well drilled in April of 1980 and gas first injected in June of 1980.

"B" designates: 80 acres outside of Section 13 contained with the West Big Twin Lake unit containing:

(1) the West Big Twin Lake 5-18 well drilled September, 1978, and completed in November.

"C" designates: the 120 acres within Section 13, within the Fawcett 2-24 production unit containing:

(1) no wells.

"D" designates: the 120 acres within Section 24 also within the Fawcett 2-24 production unit containing:

(1) the Fawcett 2-24 well drilled in 1977 and produced thereafter.

"E" designates: the 120 acres in the West Bay Little Twin Lake production unit all within Section 13 containing:

(1) the West Bay Little Twin Lake well drilled October 1, 1982.